# FRANK CONRAD ET AL. v. DEPARTMENT OF NATURAL RESOURCES

[No. 643, September Term, 1975.]

*Decided March 2, 1976.*

The cause was argued before ORTH, C. J. and THOMPSON, MENCHINE and MASON, JJ.

*R. Edwin Brown,* with whom was *F. Archie Meatyard, Jr.* on the brief, for appellants.

*Glenn B. Harten, Special Attorney* and *Edward F. Lawson, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *Nolan H. Rogers, Special Assistant Attorney General* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

We are called upon in this appeal to decide if the Circuit Court for St. Mary's County erred in denying additional compensation in a condemnation action to persons displaced from a dwelling occupied by them. We hold that it did not err.

## STATEMENT OF THE CASE

On 7 October 1974 a jury was empanelled in the Circuit Court for St. Mary's County, sworn and charged to ascertain and determine whether it would be necessary for James B. Coulter, Secretary, Department of Natural Resources, acting for and in behalf of the State of Maryland (the State) to acquire certain property and "to inquire into, ascertain and jointly and impartially value the damages" which Frank Conrad and Waneta Conrad, his wife, and James McLearen and Martina McLearen, his wife (Condemnees) would sustain by its taking. The jury found that it was necessary for the State to acquire the property and fixed the damages to be sustained by the Condemnees for their fee simple interest and estate in the parcel of land and improvements thereon in the amount of $15,000. Judgment *nisi* against the State in favor of Condemnees in the sum of $15,000 was

entered on 7 October and final judgment on 14 October. This judgment is not challenged.

It appears that following the return of the inquisition by the jury, Condemnees moved in open court that they be awarded $4,000 as displaced persons as was allowed by law. On 13 January 1975 they filed a Motion for Additional Payment. The Motion was heard on 6 March and denied by order of the court on 26 May. The appeal of Condemnees from that order is before us.

## THE FACTS

The record on this appeal is a statement of the case prepared by the parties with the approval of the lower court and filed with the clerk thereof as authorized by Maryland Rule 1026, § e.[1] As this statement supersedes, for the purposes of appeal, all parts of the record other than the judgment from which the appeal is taken and any opinion of the lower court, we set it out.

"On or about the 5th day of June, 1967, Spencer P. Ellis, Director, Department of Forests and Parks, acting for and on behalf of the State of Maryland, filed a condemnation action in the Circuit Court for St. Mary's County, Law No. 3849,

---

1. Rule 1026, § e, formerly Rule 1026, § g (see amendment adopted 16 June 1975, effective 1 July 1975), provides:

"When the questions presented by an appeal can be determined by this Court without an examination of all the pleadings and evidence, the parties with the approval of the lower court may prepare and sign a statement of the case showing how the questions arose and were decided, and setting forth so much only of the facts alleged and proved, or sought to be proved, as is essential to a decision of such questions by this Court. Such statement, when filed with the clerk of the lower court shall be treated as superseding, for the purposes of the appeal, all parts of the record other than the judgment from which the appeal is taken and any opinion of the lower court, and, together with such judgment and opinion, shall be certified to this Court as the record on appeal."

See Hoffman v. Glock, 20 Md. App. 284, 295 (1974); McAlily v. Bailey, 18 Md. App. 413, 416-418 (1973). Compare Rule 1026, § e, as to which the procedure therein authorized is followed in the court below, with Rule 1028, § g, as to which the procedure therein authorized is invoked after the record reaches this Court.

against Frank Conrad and Waneta Conrad, his wife; James McLearen and Martina McLearen, his wife; and Edward J. Spence and Claudine Spence, his wife, for the condemnation of the property in these proceedings, being Lots 25 and 26, Block 31, as shown on the plat of Point Lookout, in Liber JMM No. 5, Folio 341. The land condemned was improved by a one story frame dwelling. The defendants, Frank Conrad and Waneta Conrad, his wife, and James McLearen and Martina McLearen, his wife, have occupied and used the dwelling in question since the time of purchase, as a second home.

The property condemned was acquired by the named defendants by deed from May Harris, widow, sole heir and administratix of the Estate of Frank W. Dowling, dated June 29, 1964, and recorded among the land records of St. Mary's County, Maryland, in Liber 114, at Folio 119, and the interest of the defendants, Edward J. Spence and Claudene Spence, his wife, was conveyed to the defendants, Frank Conrad and Waneta Conrad, his wife, by deed dated the 28th day of March, 1967, recorded the 14th day of April, 1967, in Liber 133 at page 68, one of the Land Records of St. Mary's County, Maryland, a photocopy of said deed being attached to this Statement of the Case.

Before the trial of the condemnation case, Spencer P. Ellis resigned as Director of the Department of Forests and Parks, and James B. Coulter, Secretary, Department of Natural Resources, became the plaintiff.[2]

---

2. The docket entry under date of 7 October 1974 reads that the court granted "Plaintiff's Motion to Amend to 'James B. Coulter, Sec., Dept. Natural Resources' in lieu of Spencer P. Ellis, Director, et al." The State, in its brief, explains the amendment thus: "Subsequent to filing of the suit, but prior to trial, the Department of Natural Resources absorbed the functions of the Department of Forests and Parks and James B. Coulter,

The case was tried on October 7, 1974. At the trial Joe Plochek, Assistant Director of Program Open Space, Department of Natural Resources, testified in behalf of the State. The statement of the case set out verbatim portions of his testimony obtained on direct and cross-examination. We give a compendium  His duties were "to coordinate the land acquisition for the state areas under natural resources, and also to coordinate the development of the state areas with the Department of Natural Resources." He was familiar with the Point Lookout State Park project. An appropriation was obtained from the General Assembly in 1962 — "[g]eneral construction loan, 1962, Forest and Parks" — and the first parcel of land in Point Lookout was purchased 15 November 1963. The Department of Natural Resources adopted Program Open Space. "It took over the acquisition program that was started under general construction, loan money" prior to 1971. "It's just a new . . . funding process in 1969 they went on the acquisition program went on to the transfer tax money which took it out of general construction loan money, bond money."

The statement of the case continued:

"An inquisition condemning the property was

---

Secretary to the Department of Natural Resources, was substituted as plaintiff."

By Acts 1969, ch. 154, the Department of Forests and Parks was made a part of the Department of Natural Resources. Code, art. 66C, § 343 (1970 Replacement Vol.) and art. 41, § 233 (a) (1971 Replacement Vol.), both repealed by Acts 1973, 1st Sp. Sess., ch. 4, § 2, effective 1 January 1974. By Nat. Res. Art. § 1-102 (a) (4) and (5) the forest service and park service are included within the Department of Natural Resources. See Revisor's Note to § 1-102 for explanation of omission of "department and agency" with respect to the forest and park services. Nat. Res. Art. § 5-201 (b) provides:

"Every right, power, duty, obligation, and function conferred upon or exercised by the Department of Forest and Parks is transferred to and exercised by the department. Every reference to the Department of Forest and Parks which appears in the Code, other laws of the state, or in any ordinance, resolution, rule, regulation, legal action, directive, or document, means the department."

Reference to "the department" means Department of Natural Resources. Nat. Res. Art. § 5-101 (c). The Revisor's Note to subsection (b) of § 5-201 states that the subsection was added as the third paragraph of art. 66C, § 343 of the Code by ch. 248, Acts 1972.

returned on the same date in the amount of $15,000.00 Following the return of the inquisition, a motion was made in open Court by the defendants that they be awarded payment in the amount of Four Thousand Dollars ($4,000.00) as displaced occupants, under the provisions of Section 12-204(b)(1) of the Real Property section of the Annotated Code of Maryland. The defendants had not acquired a comparable replacement dwelling."

Waneta Conrad, one of the Condemnees, was called to testify in their behalf on the motion. A verbatim transcript of her testimony was given in the statement. We summarize it. She and the other Condemnees "personally" owned the property condemned. She, "as owner, occupied that property for more than ninety days prior to the condemnation. . . ." She had ascertained the rental value of the property. "[T]here is nothing that rents cheaper than a hundred dollars a week, and I figure we could get one twenty-five [per week] for the twenty seasonal weeks . . ." from May through October. That period was the normal rental season for recreational property. She had investigated other units in the neighborhood and was satisfied that the fair rental of her property was $125 per week. The Condemnees were claiming the rental value "rather than going into another property." The statement of the case continued:

"The Court took the motion of the defendants for additional payment under advisement. The condemnation award was paid to the Clerk of the Court on or about January 7, 1975, and the plaintiff acquired title to the defendants' property.

The defendants on January 13, 1975, filed a motion for additional payment, pursuant to the provisions of Section 12-204 in the amount of Four thousand dollars ($4,000.00) and of payment of Four Hundred Dollars ($400.00) moving expenses, pursuant to the provisions of Section 12-205, and a pro rata portion of the land taxes in the amount of Eighty-seven dollars and eighty-seven cents ($87.87), pursuant to

Section 12-110 (a) and (c). The defendants further moved that they be awarded interest in the amount of Two Hundred and twenty-five dollars ($225.00) to cover interest at the legal rate from October 7, 1974, the date of the inquisition, through January 7, 1975, the date of payment into Court.

The Court by its Order dated May 26, 1975, denied the defendants' motion for additional payments under Section 12-204 (a); the defendants' motion for additional payments under Section 12-205 (a) (1); and the defendants' motion for payment of interest."[3]

## THE LAW

Additional payments to displaced[4] persons are provided under two sections of the Real Property Article. Section 12-202 states that a public or private agency shall make such payments, but § 12-203 places a limitation thereon. "The additional payment authorized by § 12-202 shall be made only to a displaced person who purchases and occupies a replacement dwelling which is decent, safe, and sanitary. . . ." Section 12-204 (a) prescribes: "[T]he public or private agency shall make a payment to or for any displaced person displaced from any dwelling and not eligible to receive a payment under § 12-202, if the dwelling actually and lawfully was occupied by the displaced person for not less than 90 days prior to the initiation of negotiations for

---

**3.** In their brief, the Condemnees state: "The denial of moving expenses and interest are not issues in this appeal. Appellees concede that the trial court was in error and have paid Appellants' moving expenses." In its brief, the State denies that it concedes that "the trial court was in error" in denying the payment of moving expenses. The State asserts: "The moving expenses were paid by the Department of General Services because the [Condemnees] were entitled to moving expenses under the provisions of [Real Prop. Art.] Section 12-112 and not because [they] were legally entitled to payment under [Real Prop. Art.] Section 12-205." In any event, only that part of the order denying payments to Condemnees as displaced persons under Real Prop. Art. § 12-204 (a) is before us.

**4.** " 'Displaced person' means any person who moves from land, or moves his personal property from land, as a result of the whole or partial acquisition of the land, or as a result of a written order of the acquiring agency to vacate land for a public works program or project undertaken by the public or private agency." Real Prop. Art. § 12-201 (c).

acquisition of the dwelling." [5] Real Prop. Art. § 12-201 (h) defines "public agency":

> " 'Public agency' means the state, a political subdivision, or any of their agencies, boards, or commissions having the right to acquire land for public purposes through the use of eminent domain or by negotiation. *The term does not include the Department of General Services if acquiring land for Program Open Space* or any political subdivision, other than Baltimore City, Baltimore, Anne Arundel and Montgomery counties, the Board of Education of Montgomery County, the board of trustees of Montgomery College or any board or agency of any of them, or any agency, board, or commission of the subdivision when acquiring property for a public purpose for which relocation assistance is not required by federal law." [6] (emphasis added)

The provisions of § 12-201 (h) came into their present form through Acts 1973, ch. 696, effective 1 July 1973, and ch. 578, approved 21 May 1973 and effective from date of passage, and Acts 1974, ch. 12, § 2, generally effective 1 July 1974.[7] Code, art. 21, § 12-201 (a), read:

---

5. Subsection (b) of § 12-204 sets out the elements of the additional payment. Paragraph (1) of subsection (b) provides that the payment may be "The amount necessary to enable the displaced person to lease for a period not exceeding four years, a decent, safe, and sanitary dwelling of standards adequate to accommodate the person in areas not generally less desirable in regard to public utilities and public and commercial facilities, and reasonably accessible to his place of employment, but not exceeding $4,000; . . . ." Paragraph (2) of subsection (b) concerns payment of an amount necessary to enable the displaced person to make a down payment on the purchase of a dwelling.

6. A "private agency" is "any public or private utility company, railroad, or other organization having the right to acquire land for a public purpose through the use of eminent domain or by negotiation." Real Prop. Art. § 12-201 (g).

Real Prop. Art. § 12-201 (h) and § 12-202 and § 12-204 formerly appeared as Code, art. 21, § 12-201 (a) (1), § 12-202, and § 12-204, respectively, which were repealed by Acts 1974, ch. 12, § 1, effective 1 July 1974. According to the Revisor, the Courts Article made changes as to style.

7. So provided by Real Prop. Art. § 15-101. However, Real Prop. Art. § 15-103 provides:

"Except as expressly provided to the contrary in this article,

"The term 'condemning authority' shall mean the State, a political subdivision or any agency thereof, or any board or commission having the right to acquire land for public purposes by eminent domain proceedings, and any public or private utility company, railroad or other organization, body or agency having the right to acquire land for a public purpose through the use of eminent domain. This term shall not include any political subdivision other than Baltimore City or any agency thereof, or any board or commission when acquiring property for a public purpose and such purpose is not wholly or partially financed by federal funds."

Chapter 696 of Acts 1973 rewrote subsection (a) of art. 21, § 12-201. Under the heading "Condemning authority", it defined "Public Agency" in paragraph (1) and "Private Agency" in paragraph (2). It added the provision: "The term [public agency] does not include the Department of General Services if acquiring land for Program Open Space . . . ." Acts 1974, ch. 12, § 2, adopting the Real Property Article, codified as its § 12-201 (h) the former art. 21, § 12-201 (a) (1), making only changes in style.[8]

Fifteen years ago the General Assembly enacted legislation with the expressed intent to provide a means whereby any county or city, or the State Department of Forests and Parks may acquire by purchase and otherwise, and through the expenditure of public funds, the fee or lesser interest in real property "in order to preserve, through limitation of their future use, open spaces and areas for public use and enjoyment." Preamble, Acts 1960, ch. 63. It declared, § 1, codified as art. 66C, § 357A (a): "The acquisition of interests or rights in real property for the

transactions validly entered into before the effective date and the rights, duties, and interests flowing from them remain valid thereafter and may be terminated, completed, consummated, or enforced as required or permitted by any statute amended or repealed by this article as though such repeal or amendment had not occurred."

8. Former art. 21, § 12-201 (a) (2) became Real Prop. Art. § 12-201 (g).

preservation of open spaces and areas constitutes a public purpose for which public funds may be expended or advanced." An open space or an open area was defined to be any space or area characterized by great natural scenic beauty or whose existing openness, natural condition, or present state of use, if retained, would enhance the present or potential value of abutting or surrounding urban development, or would maintain or enhance the conservation of natural or scenic resources. The intent and purpose of the legislation remained steadfast through amendments and revision. See Nat. Res. Art. § 5-1201 and § 5-1202.

In 1970 the General Assembly declared there was a need for a program to make funds available to State agencies and subdivisions in order to expedite the acquisition of outdoor recreation and open space areas "before the escalating cost of land prevents its purchase for public use and before potential areas are devoted to some other use" and "to accelerate the development of needed outdoor recreation facilities. Acts 1970, ch. 606, codified as art. 66C, § 357B (a), under the subtitle "Program Open Space". In effectuating the purposes of § 357B, the General Assembly had established a funding program the previous year. Acts 1969, ch. 403, authorized the creation of a State debt of sixty million dollars to be known as the "Outdoor Recreation Land Loan of 1969" or "Program Open Space". See art. 66C, § 357B (c). Section 5 (b) of ch. 403, Acts 1969, provided that one-half of the funds available be appropriated by named State agencies, one of which was the Department of Forests and Parks. "These funds shall be used for State acquisition projects." Section 11 of the Act designated, for the fiscal year 1970, the allocation of the funds appropriated by § 5 (b). Under the heading "State Parks", item (4) allocated $191,000 for "Point Lookout (St. Mary's County: Land Acquisition (approximately 191 acres))." Subsequent amendments of art. 66C, § 357B were in furtherance of the purpose of the legislation, and the revision leading to the repeal of the law by Acts 1973, 1st Sp. Sess., ch. 4, § 2, effective 1 January 1974, made, in the main, only stylistic changes. The Program

Open Space provisions now appear in Nat. Res. Art. §§ 5-901 to 5-907.

Originally, the Program Open Space legislation, in apportioning the funds, included the Department of Forests and Parks as one of the State agencies to share in one half of the funds available under the Program to be used for acquisition projects. Code, art. 66C, § 357E (a). Acts 1972, ch. 626, designated former § 357E as § 357D and rewrote it. As rewritten, the State agencies specified to receive one half of the funds available under the Program, to be used only for land acquisition projects, were the Department of Natural Resources and the St. Mary's city commission. Art. 21, § 357D (a). As revised by Nat. Res. Art. § 5-903 (a), it reads: "One half of the funds available under this program shall be used for recreation and open space purposes by the department and the St. Mary's City Commission." [9]

As we have indicated, note 2, *supra*, the Department of Forests and Parks was made a part of the Department of Natural Resources by Acts 1969, ch. 154, effective 1 July 1969. By ch. 348, Acts 1972, the legislature made clear the role of the Department of Natural Resources by adding a third paragraph to Code, art. 66C, § 343 (now Nat. Res. Art. § 5-201 (b) with stylistic changes) declaring:

> "From and after July 1, 1972, all rights, powers, duties, obligations, and functions heretofore con-ferred upon or exercised by the Department of Forests and Parks shall be transferred to and exercised by the Department of Natural Resources; and all references to the Department of Forests and Parks appearing in this Code, in other laws of the State, or in ordinances, resolutions, rules, reg-ulations, legal actions, directives, or documents, shall be deemed to mean the Department of Natural Resources."

By Acts 1969, ch. 403, § 9, codified as art. 78A, § 19A (a), a Land Acquisition Division was created under the

---

**9.** The "department" means Department of Natural Resources. Nat. Res. Art. § 5-101 (c).

Department of Public Works with the direction: "Land for State projects funded under . . . 'Program Open Space' shall be acquired exclusively by this Division. The Land Acquisition Division is charged with the sole responsibility to acquire land for State projects funded under . . . 'Program Open Space' . . . ." [10] By Acts 1970, ch. 97, § 3, the Land Acquisition Division was removed from the Department of Public Works and placed under the Department of General Services. Section 19A (a) of art. 78A was enacted in its present form by Acts 1972, ch. 72, passed as an emergency measure, approved 17 April 1972 and effective from the date of its passage. It reads, in part pertinent to our inquiry:

> "There shall be a land acquisition division under the Department of General Services. Land for all public improvements . . ., including those State projects funded under . . . 'Program Open Space' shall be negotiated exclusively by this division; and all State acquisitions shall be made in the name of the using State agency or in the name of the principal department of the State government of which the using agency is a constituent part. . . . All eminent domain proceedings filed by the State of Maryland in the name of a director or secretary and now pending in the courts of the State shall be valid, legal and effective without the necessity of joining the Secretary of General Services as a party to each proceeding." [11]

The power of eminent domain is a prerogative of sovereignty limited by § 40, Art. III of the Constitution of Maryland.[12] *Boswell v. Prince George's County*, 273 Md. 522,

---

**10.** The life of the Division was limited: "The Division shall be established for a period necessary to carry out a five-year acquisition program and shall cease to exist when it has fulfilled its responsibilities under the program." The limitation was removed by Acts 1970, ch. 97, § 3.

**11.** The Secretary of General Services, with the approval of the Governor, appoints a chief of the land acquisition division, who serves at the pleasure of the Secretary. The chief of the division, who shall be experienced in the field of land acquisition, is responsible to the Secretary for discharging the functions of the division. Code, art. 78A, § 19A (b).

**12.** Art. III, § 40 of the Constitution of Maryland provides: "The General

530 (1975); *Ridings v. State Roads Comm'n.*, 249 Md. 395, 399 (1968). Real Prop. Art. § 12-207 (i) provides: "If any interest in land is to be acquired by exercise of the power of eminent domain, the public agency concerned shall institute a formal condemnation proceeding." Md. Rule U4, § a requires: "A proceeding for condemnation shall be brought by the State, municipal or other corporation, commission, board, body or person seeking to have the property condemned, . . . ."

*Summary of the Law*

In 1960 the Department of Forests and Parks received legislative authority to acquire land in order to preserve open spaces and areas for public use and enjoyment. In 1969 the Department of Forests and Parks was made a part of the Department of Natural Resources. In that year, also, the legislature established a funding program for the acquisition of land under Program Open Space, and a Land Acquisition Division was created under the Department of Public Works to acquire land for State projects so funded. Some of the funds were allocated for the acquisition of land by the State at Point Lookout and were made available to the Department of Forests and Parks. In 1970 legislation was enacted implementing Program Open Space, and the Department of Forests and Parks was again designated as one of the agencies to which funds to acquire such land were available. In 1970 the Land Acquisition Division was placed under the Department of General Services. In 1972 the General Assembly made clear that all the rights, powers, duties, obligations and functions theretofore exercised by the Department of Forests and Parks were to be exercised by the Department of Natural Resources. The same year the legislature spelled out once more that land for Program Open Space was to be negotiated exclusively by the Land

Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties. or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.

The case *sub judice* does not arise under the "quick-take" statutes authorized by §§ 40A-40D.

Acquisition Division under the Department of General Services. All such acquisitions, however, were to be made in the name of the using State agency or in the name of the principal department of the State government of which the using agency is a constituent part. It was expressly provided that all eminent domain proceedings then pending in the name of a director or secretary were valid, legal and effective without the necessity of joining the Secretary of General Services as a party.

## ISSUE FOR DECISION

The trial judge disposed of the request for additional payments by finding that the Condemnees were not eligible for the payments because it was not established that the dwelling "actually and lawfully was occupied by [them] for not less than 90 days prior to the initiation of negotiations for acquisition of the dwelling." His opinion noted that Waneta Conrad testified that she had occupied the dwelling for more than 90 days prior to the "condemnation" of the property, but, he pointed out, "There was no testimony . . . that any of the Defendants actually and lawfully had occupied the premises for the required time prior to the initiation of negotiations for its acquisition." Condemnees look askance at this reason for denying their request. They state baldly that in view of Mrs. Conrad's testimony, the court should have allowed payment. They declare that payments under Real Prop. Art. § 12-204 (a) are mandatory and not discretionary. They assert that if the court was not satisfied that they had been in possession for the required time, "it should have questioned the witness *sua sponte* or at the very least ordered a further hearing to make certain that the intent of the statute was satisfied." They add: "Furthermore, since the Court had before it an Affidavit filed by Mrs. Waneta Conrad, averring that she and the other [Condemnees] had possession of and occupied the condemned property continuously from the time of purchase up to and including the date of trial, and that [the Condemnees] occupied the premises for more than ninety days before commencement of negotiations, the Court erred

in not setting the matter for further hearing or awarding additional payments to the [Condemnees]."

## DECISION

We first observe that payments under § 12-204 (a) are not to be automatically made. Those who desire additional payments as displaced persons have the burden of establishing that they are entitled to them. One of the criteria for eligibility is that the displaced person shall have occupied the dwelling "for not less than 90 days prior to the initiation of negotiations for acquisition of the dwelling." The trial judge, looking at the testimony of Mrs. Conrad, thought that the Condemnees had not proved the required occupancy. But the statement of the case, signed by the Condemnees, the State, and the trial judge, and filed pursuant to Rule 1026, § e, includes the flat statement: "The defendants, Frank Conrad and Waneta Conrad, his wife, and James McLearen and Martina McLearen, his wife, have occupied and used the dwelling in question since the time of purchase, as a second home." The time of purchase, according to the statement, was 29 June 1964. We next observe that the statement of the case filed pursuant to Rule 1026, § e, "shall be treated as superseding, for the purposes of the appeal, all parts of the record other than the judgment from which the appeal is taken and any opinion of the lower court. . . ." The statement does not indicate when negotiations were started by the State to acquire Condemnees' property, and the affidavit to which Condemnees refer in their brief is not included therein. Thus, the affidavit is not before us in any event. On the record we are permitted to consider, the judgment of the court below on the evidence was not clearly erroneous and we may not set it aside. Md. Rule 1086.

Of course, even if Condemnees had, in fact, occupied the dwelling for not less than 90 days prior to the initiation of negotiations for its acquisition, this would not, in itself, entitle them to the additional payments. The clear dictate of § 12-204 (a), considered in the light of § 12-201 (h), is that no additional payments shall be made to displaced persons

when the land is acquired by the State for Program Open Space. The trial judge, in his opinion, did not base his decision with respect to the additional payments under § 12-204 (a) on this ground, but the question was tried and decided below on the request by Condemnees for moving expenses under § 12-205. Under that section the "public or private agency" shall make payment for moving expenses on proper application by a displaced person. Section 12-201 (h) comes into play just as it does with respect to § 12-204 (a). In denying the request for moving expenses, the judge referred to § 12-201 (h). He found that, although Program Open Space did not exist when this action was commenced, Plochek had made it clear "that Program Open Space took over the administration of acquisitions and development formerly carried on by the Department of Forests and Parks." Such acquisitions, the judge said, were actually negotiated by the Department of General Services, pursuant to art. 78A, § 19A, and coordinated with the Department of Natural Resources and Program Open Space. "It was Mr. Plochek's function to coordinate the acquisition of land at Point Lookout for Program Open Space with [the Department of General Services], which would actually carry on negotiations." He thought that the statute was not well drafted and that the exact relationship of the Department of General Services to Program Open Space was not clear. But, he concluded, the intent of the legislature "appears to have been to excuse takings for Program Open Space from liability for moving expenses under § 12-205 (a) (1)." He found: "that the instant case involves an acquisition for Program Open Space has been made adequately to appear."

It is patent that the Department of General Services is not a private agency within the meaning of the Relocation and Assistance subtitle of the Real Property Article. See footnote 6, *supra.* Therefore, if the Condemnees' property was acquired by General Services for Program Open Space, General Services is not a public agency within the meaning of the subtitle either. Section 12-204 (a) directs that additional payments shall be made to displaced persons by a public or private agency, and if General Services is neither

one in the contemplation of the statute, the Condemnees here would not be entitled to the additional payments they seek as displaced persons in any event. Condemnees ignore this hurdle they would have to overcome even if they met the occupancy requirements. But the Program Open Space question, in reality, goes to the heart of the matter. The State meets it squarely: "Assuming, without admitting, that the [Condemnees] had established that they had actually occupied the dwelling for the necessary period preceding negotiations for its acquisition, they still would not be entitled to benefits as displaced persons for the same reason they are not entitled to moving costs under [Real Prop.] Section 12-205 (a) (1) i.e. the instant acquisition is for Program Open Space and as such is exempted from the effect of [Real Prop.] Section 12-204. This Section requires payments by 'public agencies' under certain circumstances. [Real Prop.] Section 12-201 (h) excludes from the definition of 'public agency' the Department of General Services 'if acquiring land for Program Open Space'."

As we have indicated, we believe that when land is acquired by the State for Program Open Space, the provisions of Real Prop. Art. § 12-204 (a) for additional payments to displaced persons are not applicable. We think it advisable, in the circumstances here, to decide whether the State acquired Condemnees' property for Program Open Space.

In the light of the law we have discussed, the condemnation proceedings pursued by the State were completely consistent with an acquisition of Condemnees' land under Program Open Space. When the action was commenced in June 1967 by the Director of the Department of Forests and Parks, that Department had enjoyed the authority for seven years to acquire real property to preserve open spaces and areas like Point Lookout for public use and enjoyment. Program Open Space simply provided the means to facilitate the acquisition of property for the purposes earlier declared. It is manifest that the Point Lookout land, consisting of 191 acres, was to be acquired under the Program because of the allocation of funds for

that express purpose for the fiscal year 1970, as we have seen. The substitution of the Secretary of the Department of Natural Resources for the Director of Forests and Parks as the plaintiff in the case, to act in behalf of the State, merely reflected statutory changes in the structure, powers and responsibilities of the departments and agencies. And, as we have indicated, the law clearly provides that although land under Program Open Space is to be acquired through negotiation by a land acquisition division under the Department of General Services, all acquisitions shall be made in the name of the using State agency or the principal department of the State of which the using agency is a constituent part. The General Assembly in 1972 flatly declared, as we have pointed out: "All eminent domain proceedings filed by the State of Maryland in the name of a director or secretary and now pending in the courts of the State [as was the proceeding here] shall be valid, legal and effective without the necessity of joining the Secretary of General Services as a party to each proceeding."

We conclude that the court below was correct in its judgment that the Condemnees' land was acquired by the State for Program Open Space. The procedural history of the action and the evidence supplied by the testimony of Plochek, considered in the light of the various enactments of the General Assembly relating to Program Open Space, were sufficient in law to support the court's holding. As the land was acquired by the State for Program Open Space, Condemnees were not entitled to additional payment as displaced persons. We so declare as an alternative reason for affirming the denial of the lower court of the application of Condemnees for additional payment under Real Prop. Art. § 12-204 (a). Those parts of the order dealing with moving expenses, taxes and interest are not before us.

> *Order of 26 May 1975 of the Circuit Court of St. Mary's County denying additional payments pursuant to Real Prop. Art. § 12-204 (a) affirmed; costs to be paid by appellants.*